UNITED STATES DISTRICT COURT SOUTHERN
DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| DINO ANTOLINI, individually and on behalf of all others similarly situated, | :     COMPLAINT |
| | : |
| Plaintiff, | :   Case No.: |
| | : |
| - against - | :   JURY TRIAL DEMANDED |
| | : |
| | : |
| ZORBX INC., DEBBIE MABROUK and ISSA MABROUK, | : |
| | : |
| | : |
| | : |
| Defendants. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - --X

      Plaintiff Dino Antolini ("Plaintiff") individually and on behalf of all others similarly situated (the "Class" and/ or "Class Members"), bring this class action lawsuit against defendants Debbie Mabrouk, Issa Mabrouk, and ZORBX Inc., ("Defendants"), for defendants' *inter alia*, unlawful deceptive acts and practices, materially misleading and false advertising, unjust enrichment, and allege as follows, based on information and belief, except as otherwise expressly stated as based on Plaintiff(s)'s personal knowledge:

## **NATURE OF THE ACTION**

1.      ZORBX Inc. ("Defendant") manufactures, distributes, markets, labels and sells cleaning and odor-removal products under its popular "ZORBX" brand name.

2.      In an effort to increase profits and to gain an advantage over its lawfully acting competitors, Defendants falsely and misleadingly label certain of its ZORBX products as being "NON-TOXIC," "FREE OF HARSH CHEMICALS," "SAFE FOR ALL SURFACES," and "SAFE FOR PEOPLE, PETS, & THE PLANET."

3.      Yet the products are **not** "NON-TOXIC," "FREE OF HARSH CHEMICALS," or "SAFE." That is because the products' formulas and ingredients (and thus the products themselves) can cause harm to humans, animals, and/or the environment.

4.      The unlawfully labeled products at issue are [ZORBX] Multi Surface Cleaner & Odor Remover, Laundry Stain & Odor Remover, Superior Stain & Odor Remover, Skunk Odor Remover, Unscented Multipurpose Odor Remover, Bath & Kitchen Cleaner, Extra Strength Mold & Mildew Remover, Heavy Duty Cleaner & Odor Remover, Black Streak & Bug Cleaner, Stainless Steel Cleaner, Carpet Spot Cleaner, and Surface Odor Remover Paint Additive (collectively, the "Products").

5.      Defendants manufacture, market, advertise, label, and sell the Products throughout New York and the United States.

6.      By falsely, misleadingly, and deceptively labeling the Products, defendants sought to take advantage of consumers' desire for non-toxic cleaning products that are safe for humans, animals, and the environment. Defendants have done so at the expense of unwitting consumers, as well as Defendants' lawfully acting competitors, over whom defendants maintain an unfair competitive advantage

7.      As a result, Plaintiff brings this action individually and on behalf of those similarly situated, and seek to represent a National Class and a New York Subclass (defined *infra*). Plaintiff seeks injunctive relief to stop defendants' unlawful labeling and advertising of the Products. In addition, Plaintiff seeks damages, interest thereon, reasonable attorneys' fees and costs, other equitable relief, and disgorgement of all benefits, pursuant to law, that defendants have enjoyed from its conduct.  Plaintiff's primary litigation objective is to enjoin defendants' unlawful labeling practices and to obtain restitution for the National Class and New York Subclass.

## JURISDICTION

8.      This Court has original jurisdiction over this action pursuant to the Class Action Fairness

Act of 2005, 28 U.S.C. § 1332(d), because the proposed Class consists of 100 or more

members; the amount in controversy exceeds $5,000,000, exclusive of costs and interest; and

minimal diversity exists. This Court also has supplemental jurisdiction over the state law

claims pursuant to 28 U.S.C. § 1367.

## VENUE

9.      Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the

events and omissions giving rise to Plaintiff's claims occurred in this District. In addition,

Plaintiff purchased the unlawful Products in this District, and defendants have marketed,

advertised, and sold the Products within this District.

## PARTIES

10.     Plaintiff Dino Antolini alleges the following based upon personal knowledge: (1) Antolini,

who is currently a resident of the City and State of New York, purchased the ZORBX Original

Non-Toxic Odor Remover Product and the Laundry Stain Remover Product from a large retailer

for approximately $37 total in approximately 2021. (2) In making the purchase, Antolini relied

upon the Product's advertising and labeling claims that are the subject of this action—namely,

the "Non-Toxic", "No Harsh Chemicals" and "Safe" claims. (3) If Antolini had known that the

Product can cause harm to humans, animals, and/or the environment, he would not have

purchased the Products. (4) Antolini continues to see the Products available for purchase and

desires to purchase them again if they were, in fact, "non-toxic"—i.e., if they truthfully did not

pose a risk of harm to humans, animals, and/or the environment. (5) Antolini is, and continues to

be unable to rely on the "truth" of the Products' "non-toxic" advertising claims. (6) Antolini does not know the exact contents, meaning, or import of the Products' ingredients. Based on information and belief, the labeling of the Product purchased by Antolini is typical of the labeling of the Products purchased by members of the National and Sub-Class.

11.     If the Products' formulas were actually non-toxic, not harsh, and safe, as labeled and advertised, Plaintiff would purchase the Products in the future. Since Plaintiff would like to purchase the Products again to obtain the advertised "non-toxic" benefits, he would purchase them again in the future—despite the fact that they were once marred by false advertising or labeling—as Plaintiff would reasonably, but incorrectly, assume the Products were improved (such that they cannot cause harm to humans, animals, and/or the environment). In that regard, Plaintiff is an average consumer who is not sophisticated in the chemistry or formulations of household cleaning products, so, like the rest of the class, he is at risk of reasonably, but incorrectly, assuming that Defendants fixed the formulation of the Products such that Plaintiff may buy them again, believing they were no longer falsely advertised and labeled. Plaintiff is, therefore, currently and in the future deprived of the ability to rely on the falsely advertised claims.

12.     Plaintiff bought the Products for household use. He wanted to avoid harm caused by harsh chemicals and understood non-toxic, not harsh, and safe in the manner identified above.

13.     Defendant ZORBX Inc. is an Ohio corporation with its principal place of business in Strongsville, Ohio, and was doing business in the state of New York during all relevant times. Directly and through its agents, Defendant has substantial contacts with and receives substantial benefits from and throughout the state of New York, not only in the sale of Products to the consumers at issue in this action, but also in the sale of numerous products to New York

businesses and consumers, in an annual approximate amount that exceeds millions of dollars. Defendant is one of the owners, manufacturers, and/or distributors of the Products, and has created, authorized, and/or ratified the false, misleading, and deceptive labeling for the Products. Defendant and its agents, since its inception in 2001, promoted, marketed, and sold the Products at issue in this jurisdiction and in this judicial district. Defendant and its agents disseminated the false and deceptive representations throughout this state and the nation through marketing, labeling, and advertising deliberately intended to encourage purchase of the Products by taking advantage of consumers' desire for non-toxic and non-harsh products that do not pose a risk of harm to humans, animals, and/or the environment.

14.    Defendant Debbie Mabrouk ("Defendant") is an Owner and Operator of ZORBX Inc. Defendant manufactures, distributes, markets, labels and sells cleaning and odor-removal solutions under the popular "ZORBX" brand.

15.    Defendant Issa Mabrouk is the Chief Operating Officer and Primary Inventor of the Products. Defendant has materially contributed to the fraudulent conduct alleged herein through, *inter alia*, knowingly mismarketing, and selling the Products as "non-toxic" and with "no harsh chemicals" and "safe" when Defendant knew that those representations were not accurate. Throughout the class period, defined *infra*, Defendant helped procure and has been privy to the information showing that the products cannot conform to those representations, yet he made them anyway. Defendant and his agents intentionally and willfully disseminated the false and deceptive representations throughout this state and the nation through marketing, labeling, and advertising deliberately intended to encourage purchase of the Products by taking advantage of consumers' desire for non-toxic and non-harsh products that do not pose a risk of harm to humans, animals, and/or the environment.

**FACTUAL ALLEGATIONS**

16.    In recent years, consumers have become especially concerned about using household cleaning and upkeep products that are safe for humans, animals, and the environment. Consumers have poured billions of dollars into the "eco-friendly" and "natural" cleaning products market. In fact, this market segment is expected to reach over $40 (Forty) Billion Dollars by 2025.

17.    In response to consumers' desire for safe and non-toxic cleaning products, many companies "<u>greenwash</u>" their products by deceptively claiming that their cleaning products are safe. Unfortunately, rather than creating the safe and non-toxic products that consumers desire, many companies, like Defendant ZORBX, have chosen instead to "greenwash" their products through deceptive labeling, suggesting and outright stating that their cleaning products are safe and non-toxic when, in fact, they can cause harm to humans, animals, and/or the environment.

18.    Recognizing this problem, the United States Federal Trade Commission ("FTC") created the "Green Guides" to help companies avoid making misleading and deceptive claims.[1] The Green Guides specifically address the use of the term "non-toxic" in the marketing of a product, stating, "A non-toxic claim likely conveys that a product, package, or service is non-toxic both for humans and for the environment generally."[2] Accordingly, "[i]t is deceptive to misrepresent, directly or by implication, that a product, package or service is non-toxic. Non-toxic claims should be clearly and prominently qualified to the extent necessary to avoid deception."[3]

---

[1] *See generally* 16 C.F.R. § 260 – Guides for the Use of Environmental Marketing Claims.
[2] 16 C.F.R. § 260.10(b)
[3] 16 C.F.R. § 260.10(a).

19.    Indeed, in commenting on the Green Guides, the Environmental Protection Agency ("EPA")

**"believes that marketers will 'rarely, if ever, be able to adequately qualify and substantiate**

**such a claim of 'non-toxic' in a manner that will be clearly understood by consumers**."[4]

20.    Further, The EPA further explained:

> [A] "non-toxic" claim conveys that a product is non-toxic for both humans and
> for the environment generally. Demonstrating a lack of toxicity in a generic sense
> involves testing for a broad array of endpoints (e.g., acute toxicity,
> carcinogenicity   and other chronic effects, developmental and reproductive
> toxicity, neurotoxicity, sensitization, etc.) across a variety of species. It is highly
> unlikely that the typical consumer product will have been subject to this degree of
> testing with a resulting finding of "no adverse effect" for each of the endpoints
> evaluated."

21.    According to the EPA, "this inference might prevent consumers from taking necessary

precautions in handling a product."

22.    The Green Guides also provide examples of marketing claims in order to "provide the

Commission's views on how reasonable consumers likely interpret certain claims." The FTC

provided the following example:

> "A marketer advertises a cleaning product as "essentially non-toxic" and "practically
> non-toxic." <u>**The advertisement likely conveys that the product does not pose any**</u>
> <u>**risk to humans or the environment, including household pets.**</u> If the cleaning
> product poses no risks to humans but is toxic to the environment, the claims would be
> deceptive."

23.    This example demonstrates that even when "non-toxic" claims are qualified by such terms as

"essentially" or "practically," they are nonetheless construed by reasonable consumers as "not

pos[ing] any risk to humans or the environment, including household pets." Thus, tautologically,

broad and unqualified non-toxic claims, such as the ones present on the Products, would even

---

[4] EPA Comments on Proposed Revisions to Green Guides 2010 (*available at*
https://www.ftc.gov/sites/default/files/documents/public_comments/guides-use-environmental-
marketing-claims-project-no.p954501-00288%C2%A0/00288-57070.pdf. (last accessed
11/15/2021)

more strongly convey the meaning that the Products do not pose any risk of harm to humans, animals, or the environment.

24.     The type of deceptive advertising and marketing employed by Defendants has been admonished by the National Advertising Division of the Council of Better Business Bureaus Inc. (NAD), which "monitors national advertising in all media, enforcing high standards of truth and accuracy" and "examines advertising claims made for . . . 'green' or natural claims.[5]

25.     As relevant here, the NAD, in its recent March 2020 recommendation that the company Windex discontinue its marketing and use of its "Non-Toxic Formula," (affirmed by the appellate National Advertising Review Board August 6, 2020), the board held that an unqualified non-toxic claim will mislead consumers to equate the term "non-toxic" with a lack of harmfulness.

26.     Specifically, the BBB and NARB concluded that an unqualified non-toxic claim will mislead "reasonable consumers to conclude that product misuse poses no health risks, even those that are not severe or are more transient in nature."[6]

### ZORBX'S PRODUCTS ARE DECEPTVIELY MISLABELED

27.     As described *supra*, Defendants manufacture, market, advertise, label, and sell ZORBX cleaning and odor-removal products.

28.     Defendants label the Products as "Non-Toxic" and "Safe for All Surfaces" and "Safe for People, Pets & the Planet" that contain "No Harsh Chemicals."

---

[5] https://bbbprograms.org/programs/nad/nad-contact-us (April 2, 2020).
[6] *See* https://bbbprograms.org/media-center/newsroom/narb-recommends-s.c.-johnson-discontinue-unqualified-non-toxic-claim-on-windex-vinegar-glass-cleaner. (Last accessed December 16, 2021)

29.     Upon information and belief, there are at least eleven Product lines at issue. Some of the

eleven are sold in multiple variations[7] of packaging, bringing the total number of mislabeled

products to eighteen. True and correct images of the Products are reprinted below. [ZORBX]:



1)  Unscented Odor Remover (for Human use and Pet/ Skunk use)



---

[7] ZORBX Odor Remover is available in approximately seven different iterations, all with the same exact ingredient disclosures, including, but not limited to [ZORBX] 1 gal. Unscented Odor Remover, 2 oz Unscented Travel Pack, 7.5 oz Unscented Odor Remover, 16 oz Unscented Odor Remover, Unscented Multipurpose Odor Remover, Unscented double deal, Unscented 3-piece value pack, Unscented 4-piece value pack, Unscented Pet Odor Remover, and Unscented Skunk Odor Remover. *See* imaging below.







2)  <u>Carpet Spot Cleaner</u>




3) <u>Superior Stain & Odor Remover</u>





4) <u>Laundry Stain & Odor Remover</u>





5) Extra Strength Bath and Kitchen





6) <u>Extra Strength Mold & Mildew Remover</u>







7)  <u>Heavy Duty Cleaner & Odor Remover</u>




8) Black Streak & Bug Cleaner





9) <u>Stainless Steel Cleaner</u>





10) <u>Multi Surface Cleaner & Odor Remover</u>



| Brand | ZORBX |
|---|---|
| Surface Recommendation | Tile |
| Special Feature | Residue Free |

## About this item

- UNSCENTED, SAFER AND STRONGER – ZorbX extra strength multi surface cleaner and odor remover is unscented and hypoallergenic, making it a suitable and safe choice for individuals with allergies, asthma and respiratory problems – you can even use it on surfaces children and babies play on!
- REMOVE A VARIETY OF STAINS – This cleaner and odor remover is a stronger and safer product and is fast cleaning for a variety of surfaces, including: acrylic/porcelain, ceramic tile, laminate/wood, aluminum/glass and much more. It's also safe to use on all appliances.
- WORKS WITHIN SECONDS – Remove even the toughest odors and clean within seconds. ZorbX extra strength multi surface cleaner and odor remover lifts, breaks up and removes stains, soils and odors at the molecular level in a single, simple step.
- NO HARSH CHEMICALS – This hypoallergenic, non-toxic multi surface cleaner is safe for all. There's 0% bleach, no harsh chemicals, perfumes or fragrances, enzymes or bacteria and it's also phthalate-free. You can rest easy knowing it's a stain remover that is safe for people, pets and the planet.
- A BRAND YOU CAN TRUST – Made in the USA, this custom formula laundry stain and odor removal spray comes with 100% performance guaranteed.

11) <u>Surface Odor Remover Paint Additive</u>



- PERFECT FOR HOMES, RENTAL UNITS, AND SCHOOLS: ZORBX odor-eliminating paint additive is perfect for getting rid of unwanted odors from homes, hospitals, rental units, schools, and much more. It will effectively tackle all the tough odors without affecting the paint's color, application, and durability. It will make the painting process simpler and more refreshing. ZORBX surface odor eliminating paint additive - Let us take the "pain" out of painting!
- ENVIRONMENT-FRIENDLY: ZORBX odor remover paint additive is free of any harmful chemicals and toxins. Therefore, it is suitable for people with respiratory problems and allergies. So now you can safely get rid of unpleasant odors and improve the air quality of your house using a ZORBX surface odor remover paint additive. Bad odors? Worry no more with ZORBX paint smell remover.
- HIGHLY COMPATIBLE: Whether you want to use standard or oil-based paint, ZORBX odor remover paint additive can be added to any paint and will do its job perfectly. So what are you waiting for? Place your order with us and paint it right!

› See more product details

- ✓ Refreshes with reactivating technology
- ✓ Derived from natural ingredients
- ✓ No harsh chemicals
- ✓ Hypoallergenic and nontoxic
- ✓ Biodegradable and environmentally safe
- ✓ Made in USA
- ✓ 100% Satisfaction Guaranteed

30.     Defendants unqualified and unsubstantiated 'Non-Toxic" marketing ploys are deceptive, misleading, and in violation of law.

31.     But first, as a preliminary matter, defendants do their absolute best to conceal what ingredients make up their products. The Products' labeling does not adequately disclose to the consuming public the true nature of the ingredients contained in the Products. Numerous state laws have prohibited such behavior. For example, Article 35 of the of New York Code of Rules and Regulations Part 659 (CRR-NY 659.6) lists New York State's required disclosures for all household cleansing products. Further, the California Cleaning Product Right to Know Act, codified at Cal. HSC Code § 108950 *et seq* (2017), mandates that chemical ingredients be fully disclosed for cleaning products marketed and sold such that "consumers and workers with ingredient information about designated products that encourages informed purchasing decisions and reduces public health impacts from exposure to potentially harmful chemicals."

32.     Specifically, rather than precisely identifying the chemical ingredients contained in the

Products, Defendants uniformly categorize numerous groups of ingredients as "**wetting and**

**cleaning agents, purified water, alcohol, odor eliminator[s], detergents, and emulsifiers."**

An example is provided below, as well as on pages 16-19 beginning with the word

"INGREDIENTS" in all white **lettering. *See* Photograph directly below.**



33.     By doing so, Defendants conceal from the consuming public the chemical ingredient makeup

of their products. The "ingredient" disclosure, if it may even be called such, is a compilation of

broad and generalized pseudo-technical categories of categorial compounds. It is little more than

a fraudulent sham designed to distract and mislead consumers from what the Products actually

contain, in direct violation of numerous state laws and regulations.[8]

34.     In fact, the photograph above is not an isolated incident; Virtually all of the Products contain

the same feigned ingredient disclosure list.

---

[8] *See e.g.,* Article 35 of the New York Environmental Conservation Law, New York Code of Rules and
Regulations Part 659 (CRR-NY 659.6) (listing NYS required disclosures for all household cleansing
products), and the California Cleaning Product Right to Know Act.  *See* Cal. HSC Code § 108950.
Pursuant to Art. 35 (explaining that cleaning product ingredient disclosures must actually disclose and
qualify the ingredients and components contained therein).

35.    Worse yet, since Plaintiff's initial communication with defendants' counsel about their unlawful behavior,[9] *defendants have uniformly removed any and all imaging of their ingredient disclosures.* They have done this both on their own website, as well as on major retailers such as Amazon, Walmart, Lowes, Ace Hardware, True Value Hardware and Bed, Bath & Beyond.

36.    Thus, rather than constructively engaging with the problems so highlighted by Plaintiff, defendants have embarked upon an intentional & deliberate coverup that is pervasive and ongoing. Plaintiff and the class are entitled to full punitive remedies at law because of Defendants' dilatory and unlawful tactics.

37.    Second, based on the "NON-TOXIC", "NO HARSH CHEMCIALS" and "SAFE" representations, reasonable consumers, including Plaintiff, believe that the Products do not pose any risk of harm to humans, animals, and/or the environment.

38.    Defendants prominently and uniformly label the front (and back) display panels of the Products with the label "NON-TOXIC" and "SAFE." The label is set against—and highlighted by—an eye-catching background and/or font color. *See* Photographs, *supra* pgs. 8-21.

39.    Defendants also prominently and uniformly label the ingredient display panel of the Products with the label "NON-TOXIC," "NO HARSH CHEMICALS", "SAFE FOR ALL SURFACES", and "SAFE FOR PEOPLE, PETS & THE PLANET."

40.    The label is set against—and highlighted by—an eye-catching background and/or font color. *See* Photograph below, as well as, *supra* pgs. 15-19.

---

[9] In October 2021 Plaintiff sent Defendants a detailed demand for action letter outlining many of the problems with the Products and their marketing. In response, Defendants scoffed at Plaintiff without engaging in any productive discussion or action.



41.    However, in spite of the labeling, <u>the Products do, in fact, pose a risk of harm to humans,</u> <u>animals, and/or the environment</u>. That is because they contain certain ingredients, which, at their given concentrations in the Products, can cause harm to humans, animals, and/or the environment.

42.    As such, while defendants make their prominent and unqualified non-toxic claims on the Products' packaging, the packaging fails to disclose the presence of the harmful and toxic compounds.

43.    Since defendants unlawfully omit both the specific chemical ingredients contained in its products, as well as and weight and concentration fraction information, despite its claim that

"that transparency is an essential part of choosing safe and effective products for your home," defendants have, by definition, committed fraudulent and deceptive practices.

44.    As such, the second prong of defendants' deception is such that the Products' ingredients are elementally inconsistent with an unqualified non-toxic claim as that term is applied and understood by consumers.

45.  Upon information and belief, Defendants began the scheme in or about 2001 and it has continued uninterrupted since that time.

## THE PRODUCTS' COMPOSITION

46.    As explained, *supra*, defendants have hidden and are hiding the ball on what actual ingredients are contained within their products.

47.    Defendants' obfuscation notwithstanding, given the ingredients that are known, (*see infra*). defendants cannot, without misrepresenting the truth, label its Products as 'Non-Toxic,' 'Not Harsh' and 'Safe for People, Animals and the Environment.'

48.    Manufacturers in the U.S. may be required to make the ingredient disclosures pursuant to state law, and in the case of chemicals with known health hazards, pursuant to the Occupational Safety and Health Administration's (OSHA's) Hazard Communication Standard.[10] The Hazard Communication Standard (HCS) (29 CFR 1910.1200(g)), revised in 2012, requires that the chemical manufacturer, distributor, or importer provide Safety Data Sheets (SDSs) (formerly MSDSs or Material Safety Data Sheets) for each hazardous chemical to downstream users to communicate information on these hazards.[11]

---

[10] Isaacs, KK, Phillips, KA, Biryol, D, Dionisio, KL, and Price, PS. 2018. Consumer product chemical weight fractions from ingredient lists. *J Expo Sci Environ Epidemiol*, 28(3): 216–222.
[11] *See* https://www.osha.gov/Publications/OSHA3514.html (citing 29 CFR § 1910.1200(g)).

49.     Many consumer products disclose ingredient lists that are constructed using specific guidelines, such as those used to develop SDSs' and Patent or Trademark applications, which are intended to provide information about the hazards posed by a substance or product.

50.     Defendants do not publicly list or disclose the concentrations of any ingredient contained in the Products. No such list or disclosure is found on the products packaging, on the products labeling, or at its operating URL: https://zorbx.com/solutions/.

51.      In order to glean the ingredient disclosures, Plaintiff's counsel has investigated the (1) available Safety Data Sheets ("SDS"), and (2) the ingredient lists of the cleaning products in question contained in the available United States Patents.

52.     Introduction and reliance on defendants Safety Data Sheets and marketing materials is proper as "[c]ourts have [taken] judicial notice of materials in the public record, such as federal copyright registrations, newspaper articles, and regulatory filings […]". *Hesse v. Godiva Chocolatier, Inc.*, 463 F.Supp.3d 453, 462 (S.D.N.Y. 2020).

53.     Similarly, introduction and reliance on defendants' Patents is prima facie appropriate where the allegations are incorporated therein by reference. *See Am. Time Exchange, LLC v. Tissot SA*, 2017 WL 4712634, at *1 n.1 (S.D.N.Y. Sept. 27, 2017) ("[A] court 'may properly take judicial notice of official records of the United States Patent and Trademark Office.").

54.     Relevant information has also been obtained from, *inter alia*, (3) toxicity studies in the published scientific literature, (4) Cosmetic Ingredient Reviews (CIRs), (5) Human and Environmental Risk Assessments (HERA) on ingredients in household cleaning products, (6) European Centre for Ecotoxicology and Toxicology of Chemicals (ECETOC) reports, (7) European Scientific Committee on Consumer Safety opinions, and (8) other regulatory documents.

55.    Upon information and belief, defendants are in possession of additional documentation that further details the exact nature of the toxic and harmful ingredients and chemicals contained within the Products.

56.    Only by examining Defendants SDS's and Patent Registrations can any member of the consuming public attempt to discern any ingredients or ingredient concentrations in the Products.

57.    An ingredient is supposed to be disclosed on an SDS if it meets the Globally Harmonized System of Classification and Labeling of Chemicals (GHS) classification criteria as a hazardous substance and its content exceeds the relevant cut-off value, or if it presents a health hazard below the cut-off value.[12] For example, a skin irritant need not be disclosed in a SDS unless its concentration is equal to or greater than 1% to 5%, depending on whether it is considered to be a skin corrosive (Category 1) or a skin irritant (Category 2or 3).

58.    A chemical substance may receive a GHS Classification when there is a minimum concentration limit of a hazardous substance to trigger the classification of a mixture containing it or where the minimum concentration presents a health hazard. For example, GHS classification H314 corresponds to a hazardous substance that causes severe skin burns and eye damage.[13] A GHS Classification is sufficient to indicate that a particular chemical substance is harmful, though it is not a necessary prerequisite.

59.    Specifically, two distinct SDSs were consulted to provide some pertinent information related to the Products' ingredients and/ or ingredient concentrations: (1) ZORBX Unscented Odor Remover Safety Data Sheet (2010 version with 2015 and 2019 revisions) and (2) ZORBX Mold & Mildew Stain Remover Safety Data Sheet.

[12] OSHA Brief. 2012. Hazard Communication Standard: Safety Data Sheets. DSG BR-3514 2/2012. https://www.osha.gov/hazcom/guidance.
[13] GHS Hazard Statement List. 2016. http://www.chemsafetypro.com/Topics/GHS/GHS_hazard_statement_h_code.html

60.    The two SDSs, along with the Defendants Patent (described *infra*) help describe some of the actual concentrations of the ingredients in the Products.

61.    Those in-use concentrations of the ingredients (listed *infra*) are capable of causing harm to people, animals, and the environment.

62.    Even with this minimal peek behind the curtain, defendants' SDSs do not come to close to properly disclosing the Products' complete chemical ingredient and weight fraction information.

63.    In the absence of chemical ingredient and weight fraction information from the supplier or from the SDSs, quantitative <u>Patent-based</u> information has historically been used to discern ingredient compositions ranges[14] and to determine the range of ingredient concentrations in the Products.

64.    To this end, The United States Patent and the Safety Data Sheet for defendants' 'Odor Remover Formula' is significant.[15]

65.    Every Product at issue contains the formula described in the Odor Remover Patent (hereinafter 'The Patent') and the matching Data Safety Sheet.[16]

66.    There are numerous chemical ingredients and chemical reactions that are part of the Products elemental makeup.

67.    As a preliminary matter, according to defendants' own data safety sheet, "**2 %** of the [oder-romoval] mixture **consists of ingredient(s) of unknown toxicity**."[17] As such, before even undertaking any examination of the known toxic chemicals contained in the products (as gleaned

---

[14] Isaacs, KK, Phillips, KA, Biryol, D, Dionisio, KL, and Price, PS. 2018. Consumer product chemical weight fractions from ingredient lists. *J Expo Sci Environ Epidemiol*, 28(3): 216–222.
[15] Mabrouk, Issa. (Filed 2008, Published 2012). *ZORBX- Deodorizing Composition and Method of Forming Thereof*. U.S. Patent No. 8,318,806. U.S. Patent Office. https://patents.google.com/patent/US20090092568A1/en
[16] *See* ZORBX Unscented Odor Remover SDS (November 2015) available at http://salkeiz.or.safeschoolssds.com/document/repo/b00d6769-df46-4335-86fb-b0688f77efe3
[17] See *supra* note 15 at 2.

from appropriate data safety sheets, patents, and product marketing/ informational materials),

defendants' deception is prima facie established. Defendants advertise as Non-Toxic and without

any Harsh Chemicals, telling the consuming public, <u>without any substantiation or qualification</u>

<u>whatsoeve</u>r, that their products are without toxic ingredients and safe. Yet, they do not even

know what 2% of their Products' ingredients contain, much less how toxic those missing

ingredients are or how the unknown quantity interacts with the other ingredients. As a matter of

law, defendants have committed deceptive practices and Plaintiff and the class are entitled to

their full remedies at law.

68.     The Odor Remover formula is also "<u>Toxic to aquatic life with long lasting effects</u>" and "may

cause slight <u>eye irritation</u>."[18]

### THE INGREDIENTS IN THE PRODUCTS ARE CAPABLE OF CAUSING HARM TO HUMANS, ANIMALS AND THE ENVIRONMENT

69.     The Products contain ingredients that are capable of causing, and have caused, harm to

humans, animals, and the environment.

70.     The Products' ingredients include, but are not limited to, the following:

- Alcohol, C12-14, Ethoxylated

- Sodium Iminodisuccinate

- Zinc Ricinoleate (Zinc Salt of Ricinoleic Acid)

- Zeolites

- Sulfosuccinic Acid

- Phosphonic Acid;

- Sodium lauryl sulfate

- Cinnamyl Alcohol

---

[18] *See id.* at 2.

71.    The toxic ingredients and their effects are listed below.

72.    **Alcohol, C12-14, Ethoxylated**: C12-14 AE7 is a non-ionic surfactant, belonging to the group of alcohol ethoxylates, with 7 moles of ethylene oxide. At concentrations as low as .1% wt, it can cause serious eye damage and irritation as well as serious skin irritation and damage.[19] It can also cause severe damage to the respiratory and/ or nervous systems if inhaled or ingested by humans and is extremely toxic to aquatic life with long-lasting effects.[20] Further, according to the classification provided by companies to European Chemicals Agency (ECHA), "this substance is very toxic to aquatic life and is harmful to aquatic life with long lasting effects."[21] Defendants' Odor Remover formula SDS describes C12-14 AE7 as occurring at a concertation of between "1-5%" as a stand-alone element. Further, another "1-5% of the same Odor Remover Formula is described as a trade secret where "[t]he exact percentage (concentration) of composition has been withheld as a trade secret." As such, C12-14 AE7 occurs in the Products between 10 to 50 times the applicable toxicity threshold.

73.    **Sodium Iminodisuccinate**: Also known as 'Tetrasodium Iminodisuccinate' and 'Iminodisuccinate Acid Sodium Salt'; an industrial chelating agent used to reduce naturally-occurring dissolving minerals and reduce coloration in cleaning products' chemical interactions. It is considered hazardous under the criteria of the U.S. Federal OSHA Hazard Communication Standard 29 CFR 1910.1200. With an in-use concentration ranging from as low as 1.0% to 35%,[22] it carries the risk of high flammability; irritation sensitization, irritation to skin, eyes, and

---

[19] https://echa.europa.eu/brief-profile/-/briefprofile/100.105.704
[20] *See* HERA, *Human & Environmental Risk Assessment - Alcohol Ethoxylates Version 2.0*, (September 2009) https://www.heraproject.com/files/34-f-09%20hera%20ae%20report%20version%202%20-%203%20sept%2009.pdf
[21] https://echa.europa.eu/substance-information/-/substanceinfo/100.105.704
[22] https://www.medline.com/media/catalog/Docs/MSDS/MSD_SDSD94459.pdf at 2.

the respiratory system.[23] Upon examining the withheld trade secret, which can be at least partially discerned from Defendants Odor Remover patent, Sodium Iminodisuccinate "comprises about 1 to 30 wt. %" of the total composition of the formula.

74.    **Zeolites**: A group of both natural and synthetic porous crystalline aluminosilicates.[24] Their composition may consist of an aluminosilicate framework containing alkali or alkaline earth cations. Zeolites exhibit fibrous, cuboidal, or other crystalline morphologies. The Products contain zeolite wt. % concentrations from 0.01 to 60 wt. %. At concentrations as little as .01 wt., %, they may evoke pulmonary changes leading to irritation of the respiratory tract and Pulmonary inflammatory responses, particularly those caused by natural occurring zeolites, can lead to fibrosis and even mesotheliomas. Synthetic zeolite structures, usually cuboidal, produce irritation of the eyes and mucous membranes.

75.    **Sulfosuccinic Acid**: A sodium-based solubility promoter surfactant used in various chemical reactions to lower the surface tension between liquids. At concentrations of just .5%, SA has H314 and H318 GHS Classifications as it "causes severe skin burns and eye damage [Danger Skin corrosion/irritation]" and "causes serious eye damage [Danger Serious eye damage/eye irritation]."[25] Sulfosuccinic acid comprises between 1 and 20 wt. % of the total composition of the Products odor remover formula.

76.    **Cinnamic Alcohol**: A primary alcohol comprising an allyl core with a hydroxy substituent at the 1-position, found as natural occurring in cinnamon. In concentrations as low as .002/2 (.001%), acute toxicity and sensitization has been found in rats, mice, rabbits, and guinea pigs.[26]

---

[23] http://www.saapedia.org/en/saa/?type=detail&id=6721
[24] John A. Thomas and Bryan Ballantyne, *Toxicological Assessment of Zeolites*, Journal of the American College of Toxicology VOL. 11(3): 259-266.
[25] https://pubchem.ncbi.nlm.nih.gov/compound/Sulfosuccinic-acid#section=GHS-Classification (last accessed December 18, 2021)
[26] https://pubchem.ncbi.nlm.nih.gov/compound/Cinnamyl-alcohol#section=FDA-Requirements (last accessed December 23, 2021)

The Environmental Working Group ('EWG'), a nonprofit, non-partisan organization that specializes in research and advocacy in the areas of toxic chemicals, drinking water pollutants, agricultural subsidies, and corporate accountability, has labeled CA as a *known human immune system toxicant or allergen*.[27] CA is found at varying concentrations of .01-60 wt. % within the Products.[28]

77.    **Sodium Lauryl Sulfate**: An anionic surfactant. The Cosmetic Ingredient Review reports that SLS is an irritant at a concentration of 2 percent or greater, and recommends that cosmetic products should not contain concentrations greater than 1 percent.[29] SLS is found at a concentration of 1-20 wt. % within the Products.[30]

78.    **Phosphonic Acid**: A phosphorus oxoacid that consists of a single pentavalent phosphorus covalently bound via single bonds to a single hydrogen and two hydroxy groups. It has a role as a fungicide. When present in chemical reactions, it has numerous GHS classifactions including: H290-Corrosive to Metals; H302-Acute oral toxicity; H314-severe skin burns/corrosion/irritation and eye damage; H318-serious eye damage; H335- respiratory irritation and organ toxicity.[31]

79.    **Zinc Ricinoleate (Zinc salt of Ricinoleic Acid)**: A castor-based purified fatty acid compound. Due to its polymeric salt structure, 'Zinc R' is limited in its ability chemically bond to odor intensive organic substances and negate their odor causing potential. The harmonized system of hazard classification gives Zinc R a score of H400 and H410,[32] meaning that it is both

---

[27] https://www.ewg.org/skindeep/ingredients/701377-cinnamyl-alcohol-CINNAMYL_ALCOHOL-CINNAMYL_ALCOHOL-CINNAMYL_ALCOHOL/ (last accessed December 23, 2021)
[28] *See supra* note 15 at 4.
[29] https://www.livestrong.com/article/174367-dangers-of-sodium-lauryl-sulfate/.
[30] *See* supra note 15 at 3.
[31] https://pubchem.ncbi.nlm.nih.gov/compound/dihydroxy_oxo_phosphanium#section=Safety-and-Hazards.
[32] https://echa.europa.eu/information-on-chemicals/cl-inventory-database/-/discli/details/114545

"acutely and chronically hazardous to the environment."[33] At concentrations as low as .3%, it is a level 2 eye irritant, skin sensitizer, and Zinc R comprises 0.01 to 60 wt. % of the odor remover formula composition.[34]

80.     Besides the ingredients listed above, between 1-8 wt. % of the Products chemicals are hidden from the public as a "Supplier Trade Secret."[35]

81.     The Supplier Trade Secret contains airborne contaminants occurring in gaseous form[36] that that can penetrate beyond the terminal bronchioles into the gas-exchange region of the lungs.[37]

82.     The airborne contaminants in the trade secret have very low respirable particulate fractions.

83.     This means that even very sporadic and limited incremental use of the Products can cause unsafe dust, chemical,  and fume particles to permeate in the radius of usage at just threshold levels of 1 wt. %.[38]

84.     The Supplier trade secret is also toxic to aquatic life with long-lasting effects, including algae and fish.[39]

85.     By no means is the above list and effects the full extent of defendants' toxic ingredient scheme.

86.     The consuming public has repeatedly voiced their anger and frustration about the Products. To this end, defendants are well aware of the issues, and have been for some time.

---

[33] https://echa.europa.eu/information-on-chemicals/cl-inventory-database/-/discli/notification-details/114545/1437973
[34] *See supra*, note 15 at 4.
[35] Mold & Mildew Stain Remover Safety Data Sheet (2018). Available at https://hw.menardc.com/main/items/media/ZORBX001/SDS/6473672.pdf at 2.
[36] *See id.* at 4.
[37] World Health Organization, *Hazard Prevention and Control in the Work Environment: Airborne Dust* (1999) https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&cad=rja&uact=8&ved=2ahUKEwjjj7y8sv_0AhWiRTABHVs3D6sQFnoECAgQAw&url=https%3A%2F%2Fwww.who.int%2Foccupational_health%2Fpublications%2Fen%2Foehairbornedust3.pdf&usg=AOvVaw3N90wxuM3Zb0g0p5aPyLY9 at 8, 18.
[38]  *See supra*, note 35 at 4, 9.
[39] *See id.* at 7.

87.     Many consumers have expressed their dissatisfaction and dismay with the Products labeling,

use, and effects. However, defendants have refused to correct their misdeeds and have willfully

neglected to fix the issues.

88.     Some of the complaints about the misrepresentations are shown below: [40]

 The Info Hunter

★☆☆☆☆  **Caution: To Some, This Stuff STINKS!!!**

Reviewed in the United States on October 29, 2014

I read all the reviews and thought, "great, this stuff sounds excellent". Went home, started spraying it in my bedroom, on a corner of my (popcorn) ceiling and two of the walls, but a little voice in my head, said, 'stop, wait and see if it's OK'. And it was NOT.

It turns out I can smell the stuff, and it has a horrendous chemical odor of its own that drives me straight up the wall and in fact makes me physically sick. I think this may be a situation where some people can smell the chemical, and others can't-- like Phenylthiocarbamide (PTC).

3 people found this helpful

[ Helpful ]  |  Report abuse

**From the United States**

 amah

★☆☆☆☆  **.does not live up to its promises..**

Reviewed in the United States on December 14, 2012

Verified Purchase

this just came today and i tried it right after carefully reading all the info..{not much info , just whats on the bottle itself} .. but i did exactly as stated.. and it does NOT work.. i sprayed and wiped a toy box that smells like toxic poison.. it magnified that bad smell..

 Lauraflora

★☆☆☆☆  **Useless and bad scent.**

Reviewed in the United States on August 12, 2020

Size: 24 Fl Oz (Pack of 1)

Did NOT work on the mildew in my utility sink. What a HORRIBLE scent! I could not get rid of it, even after rinsing, scrubbing with lemon dish soap, and even using a bit of bleach I had. I don't usually give bad reviews. I like to use environmentally safe products, but this stuff was terrible. I will not use the rest of it the bottle. Ugh!

---

[40] All reviews incorporated herein found directly at https://www.amazon.com/zorbx.

35

 Loveology

★☆☆☆☆ **Didn't work for me; bad chemical smell**

Reviewed in the United States on April 13, 2018

**Verified Purchase**

Has a really bad chemical smell on its own, which actually made the odor problem I was trying to get rid of worse.

 Betty

★☆☆☆☆ **Can't even give one star. Intense chemical smell**

Reviewed in the United States on July 15, 2020

**Verified Purchase**

This was supposed to be unscented !!! We sprayed it to get rid of cigar smoke . OMG We Can't even open the door to that room now because of the intense chemical smell. Have the windows open , two days already and smell is still intense. It even clings to your clothes So I fear the rugs and cushions in that room will need replaced

Gave the one star because it won't let me go forward without

 Thomas Warden

★☆☆☆☆ **Does not work**

Reviewed in the United States on September 10, 2020



Size: 24 Fl Oz (Pack of 1)

Did not work. Toxic smell. Gave me a headache.

Helpful    |    Report abuse

 Alagille

★★☆☆☆ **Don't waste your money. Did not remove mold or mildew, but smells nice.**

Reviewed in the United States on August 16, 2020

Size: 24 Fl Oz (Pack of 1)

Smells nice, but that's about all it did. It did not remove mold or mildew and money wasted. The "eco-friendly" part was a factor in my decision to buy, but had to ultimately buy another product.

Helpful    |    Report abuse

 Claire

★☆☆☆☆  **Don't buy this! It creates an awful chemical stench.**

Reviewed in the United States on April 1, 2018

**Verified Purchase**

Awful chemical smell. Based on the reviews, I bought this to help remove odor from some cotton curtains that were off-gassing. I sprayed it on the curtains, and during the process I could tell that this product is not odorless. I don't know how it can even claim that! For about 10 minutes the curtains just smelled like alcohol, but now they smell even worse, with a new awful chemical smell. I now have to throw them out.

And worse, I've realized that during the application process, some of it must have gotten on the carpet and the furniture (because the spray nozzle is not very good), and now my office reeks of a chemical smell that I can't get rid off. One client said my office now smells like nail polish.

 karnem

  **Horrible toxic smell**

Reviewed in the United States on March 11, 2013

We used ZorbX to remove a rubber odor under the sink. ZorbX's odor is worse than the original, and the fumes are toxic. It made it hard for me to breath. It is in no way unscented. It has a strong, caustic odor. My kitchen is now unusable!

 Mika

  **Bad** scent

Reviewed in the United States on February 22, 2021

**Verified Purchase**

Product smells like straight rubbing alcohol definitely not unscented.

Helpful  |  Report abuse

 lexi

  **Hmmmm, Not sure**

Reviewed in the United States on January 16, 2012

I got this product from another store. And it will get rid of odor. But everytime I have used this product I always get headaches and feel dizzy. A couple times I had heart palpitations.

 Retaking Humanity

★☆☆☆☆ **This does not work and it leaves your house a glue trap.**

Reviewed in the United States on July 29, 2014

This product flat out does not work. I bought it on the official site. When I received it I spritzed a bit into the air to clean the air and the rest I reserved for a chair. I used on entire 32 fl oz bottle on one chair cover. It first seemed to have done something but when the alcohol smell wore off the smell was still there. I took it outside after discovering that the "spritzes" in the air had now turned my floors walls and any other surface into a glue trap. It was so sticky in fact my foot kept coming out of my house shoe. Outside. I continued to bombard the cushion cover with the entire bottle of cleaner. It did absolutely nothing. After all of this and paying for shipping and the item all I received was a headache and had to clean my entire home again to get the very glue like residue off of my floors walls tables and leather chair. It was miserable. It does say on the bottle it may make hard surfaces tacky but what it doesn't say is not so much tacky but similar glue. It took nail polish remover to get it off the bottom of my house shoes so they did track that sticky mess back around my house. What good is an air and surface cleaner that leaves all hard surfaces glue feeling? Even the walls everything. I put alot of faith into the 5 star reviews of this product and had high hopes for its miracle cure. It would have been less of a hassle if I had just saved my 25 bucks. Hope this helps.

 Gerald Wodkins

★☆☆☆☆ Bad for allergies

Reviewed in the United States on January 19, 2021

Size: 24 Fl Oz (Pack of 1) | Verified Purchase

Product is advertised as scent free and a safer, more natural product than harsh chemical cleaner but this is a very smelly product. Burned my lungs for hours after use. Worse affect on my allergies than bleach. Caustic and nasty. I would give less than 1 star if possible.

4 people found this helpful

  Isaiah 54:17

★★☆☆☆ **Will compromise the gear you spray it on.**

Reviewed in the United States on March 20, 2019

**Verified Purchase**

Strong alcohol smell. This will break down gear that you spray it on.

| Helpful | | Report abuse |
|---|---|---|

## PLAINTIFFS AND REASONABLE CONSUMERS WERE MISLED BY THE PRODUCTS

89.    Labeling the Products as being "NON-TOXIC", containing "NO HARSH CHEMICALS",

"SAFE FOR ALL SURFACES", and "SAFE FOR PEOPLE, PETS, & THE PLANET" when the

Products can cause harm to humans, animals, and/or the environment is wholly misleading and deceptive.

90.     By misleadingly and deceptively labeling the Products, as described herein, Defendants sought to take advantage of consumers' desire for true non-toxic, safe cleaning products. Defendants have done so at the expense of unwitting consumers—many of whom seek to use safe products and protect their household members and pets—and Defendants' lawfully acting competitors, over whom Defendants maintain an unfair competitive advantage.

91.     The representations described above were and are material to reasonable consumers, including Plaintiff, in making purchasing decisions. Indeed, Plaintiff relied on Defendants' misrepresentations, described herein, in making the decision to purchase the Products.

92.     At the time Plaintiff purchased the Products, Plaintiff did not know, and had no reason to know, that the Products' labeling and advertising were false, misleading, deceptive, and unlawful as set forth herein.

93.     Defendants materially misled and failed to adequately inform reasonable consumers, including Plaintiff, that the Products can cause harm to humans, animals, and/or the environment.

94.     Plaintiff and reasonable consumers would not have purchased the Products if they had known the truth. Accordingly, based on Defendants' material misrepresentations and omissions, reasonable consumers, including Plaintiff, purchased the Products to their detriment.

95.     It is likely, however, that Plaintiff would purchase the Products in the future if they were properly labeled, and/or the Products complied with the labeling and advertising statements. Specifically, Plaintiff would like to purchase the Products again if the Products no longer posed a risk of harm to humans, animals, and/or the environment. However, Plaintiffs do not know

whether the Products will be truly non-toxic, not harsh, and safe, and, otherwise, are unable to rely in the future on the Products' advertising claims.

## THE PRODUCTS ARE SUBSTANTIALLY SIMILAR

96.    Plaintiff purchased the ZORBX Original Non-Toxic Odor Remover Product and the Laundry Stain Remover Product. The additional-unpurchased Products are substantially similar to the Products purchased by Plaintiff. All eleven Products are cleaning and odor remover products sold by Defendants that are advertised and intended for household cleaning. All of the Products are marketed, advertised, and sold under the ZORBX brand. All of the Products are sold to consumers as "Non-Toxic", "Not Harsh" and "Safe for People, Pets, & the Planet." All of the Products are labeled with the same claims, presented on both the front horizontal ribbon of the packaging and on both sides of the back labeling. The labels are placed in the same location on each Product's packaging. All of the Products are sold in similarly looking "spray bottles" of identical shape and size, and all are designed to be applied by consumers in the same way. All of the Products can cause harm to humans, animals, and/or the environment. All of the Products contain overlapping ingredients, including ingredients that pose a risk of harm to eyes, skin, lungs, aquatic life, and natural habitats. All of the Products contain the odor remover formula. All of the misleading effect of the Products' labels is the same for all Products.

## CLASS ACTION ALLEGATIONS

97.    Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of themselves and all others similarly situated, and as members of the Classes defined as follows:

> All residents of the United States who, within the applicable time period of Defendants' fraud, purchased the Products ("Nationwide Class"); and

All residents of New York who, within the applicable time period of Defendants' fraud, purchased the Products ("New York Subclass").

98.    Excluded from the Class are: (i) Defendants, its assigns, successors, and legal representatives; (ii) any entities in which Defendants have controlling interests; (iii) federal, state, and/or local governments, including, but not limited to, their departments, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions; (iv) all persons presently in bankruptcy proceedings or who obtained a bankruptcy discharge in the last three years; and any judicial officer presiding over this matter and person within the third degree of consanguinity to such judicial officer.

99.    Plaintiff reserves the right to amend or otherwise alter the class definitions presented to the Court at the appropriate time in response to facts learned through discovery, legal arguments advanced by defendants, or otherwise.

100.    This action is properly maintainable as a class action pursuant to Federal Rule of Civil Procedure 23 for the reasons set forth below.

101.    **Numerosity:** Members of the Class are so numerous that joinder of all members is impracticable. Upon information and belief, the Nationwide Class consists of tens of thousands of purchasers (if not more) dispersed throughout the United States, and the New York Subclass likewise consists of thousands of purchasers (if not more) dispersed throughout the State of New York. Accordingly, it would be impracticable to join all members of the Class before the Court.

102.    **Common Questions Predominate:** There are numerous and substantial questions of law or fact common to all members of the Class that predominate over any individual issues. Included within the common questions of law or fact are:

a. Whether Defendants engaged in unlawful, unfair or deceptive business practices by advertising and selling the Products;

b.  Whether Defendant's conduct of advertising and labeling the Products as being "NON-TOXIC" "NOT HARSH" and "SAFE" when the Products' formulas (and thus the Products themselves) can cause harm to humans, animals, and/or the environment constitutes an unfair method of competition, or unfair or deceptive act or practice, in violation of NY §§ GBL 349 and 350;

c. Whether Defendants used deceptive representations in connection with the sale of the Products in violation of NY §§ GBL 349 and 350;

d. Whether Defendants represented that the Products have characteristics or quantities that they do not have in violation of NY §§ GBL 349 and 350;

e. Whether Defendants advertised the Products with intent not to sell them as advertised in violation of NY §§ GBL 349 and 350;

f. Whether Defendant's labeling and advertising of the Products are untrue or misleading in violation of NY §§ GBL 349 and 350;

g. Whether Defendants knew or by the exercise of reasonable care should have known its labeling and advertising was and is untrue or misleading in violation of NY §§ GBL 349 and 350;

h. Whether Defendants' conduct is a deceptive and unfair business practice within the meaning of NY § GBL 349;

i. Whether Defendants knew or by the exercise of reasonable care should have known that its labeling and advertising was and is untrue or misleading in violation of NY §§ GBL 349 and 350;

j. Whether Plaintiff and the Class paid more money for the Products than they actually received;

k. How much more money Plaintiffs and the Class paid for the Products than they actually received;

l. Whether Defendants' conduct constitutes breach of express warranty;

m. Whether Plaintiff and the Class are entitled to equitable and/or injunctive relief;

n. Whether Defendants were unjustly enriched by its unlawful conduct;

o. Whether Plaintiffs and the Class have sustained damages as a result of Defendants' unlawful conduct; and

p. The proper measure of damages sustained by Plaintiffs and Class Members.

103.        **Typicality**: Plaintiff's claims are typical of the claims of the Class Members he seeks

to represent because Plaintiff, like the Class Members, purchased defendants' misleading and

deceptive Products. Defendants' unlawful, unfair and/or fraudulent actions concern the same

business practices described herein irrespective of where they occurred or were experienced.

Plaintiff and the Class sustained similar injuries arising out of defendants' conduct. Plaintiff's

and Class Members' claims arise from the same practices and course of conduct and are based on

the same legal theories.

104.        **Adequacy**: Plaintiff is an adequate representative of the Class he seeks to represent

because his interests do not conflict with the interests of the Class Members Plaintiff seeks to

represent.  Plaintiff will fairly and adequately protect Class Members' interests and has

retained counsel experienced and competent in the prosecution of complex class actions and tort

law, including complex questions that arise in high stakes-litigation.

105.        **Superiority and Substantial Benefit:** A class action is superior to other methods for

the fair and efficient adjudication of this controversy, since individual joinder of all members of

the Class is impracticable and no other group method of adjudication of all claims asserted

herein is more efficient and manageable for at least the following reasons:

> a. The claims presented in this case predominate over any questions of law or fact, if
> any exist at all, affecting any individual member of the Class;
> b. Absent a Class, the members of the Class will continue to suffer damage and
> Defendants' unlawful conduct will continue without remedy while Defendants profit
> from and enjoys its ill-gotten gains;
> c. Given the size of individual Class Members' claims, few, if any, Class Members
> could afford to or would seek legal redress individually for the wrongs Defendants
> committed against them, and absent Class Members have no substantial interest in
> individually controlling the prosecution of individual actions;

<u>d.</u> When the liability of Defendants has been adjudicated, claims of all members of the Class can be administered efficiently and/or determined uniformly by the Court; and

<u>e.</u> This action presents no difficulty that would impede its management by the Court as a class action, which is the best available means by which Plaintiff and Class Members can seek redress for the harm caused to them by defendants.

106.    Because Plaintiff seeks relief for all members of the Class, the prosecution of separate actions by individual members would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for defendants.

107.    The prerequisites to maintaining a class action for injunctive or equitable relief pursuant to Fed. R. Civ. P. 23(b)(2) are met, as defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or equitable relief with respect to the Class as a whole.

108.    Plaintiff and his counsel are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

**First Cause of Action:**
**(1) Violation of New York GBL § 349**
**(On Behalf of Plaintiff and the Class)**

109.    Plaintiff incorporates by reference all preceding paragraphs.

110.    New York General Business Law Section 349 ("GBL § 349") declares unlawful "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state...."

111.    The conduct of Defendants, including its unsubstantiated safety and toxicity claims and package labeling and marketing, and other conduct alleged herein constitutes recurring, "unlawful" deceptive acts and practices in violation of GBL § 349. Defendants misleadingly, inaccurately, and deceptively presents its Products to consumers.

112.    Defendants' improper consumer-oriented conduct is misleading in a material way in that it, inter alia, induced Plaintiff and other Class members to purchase and/or pay a premium for defendants' Products when they otherwise would not have.

113.    Defendants made their untrue or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

114.    Plaintiff and other Class members have been injured inasmuch as they paid a premium for the Product. Accordingly, Plaintiffs and other Class members received less than what they bargained or paid for.

115.    As a result of the false and misleading labeling, the Products are sold at a premium price, approximately no less than $10.59 for 16-ounce ZORBX containers, excluding tax, compared to other similar products represented in a non-misleading way.

116.     Defendant's deceptive and misleading practices constitute a deceptive act and practice in the conduct of business in violation of New York General Business Law §349(a) and Plaintiff and other members of the Class have been damaged thereby.

117.    As a result of defendants' recurring deceptive acts and practices, Plaintiff and other Class members are entitled to monetary and compensatory damages, restitution and disgorgement of all moneys obtained by means of defendants' unlawful conduct, interest; and attorneys' fees.

**Second Cause of Action:**
**(2) Violation of New York GBL § 350**
**(On Behalf of Plaintiff and the Class)**

118.    Plaintiff repeats and realleges each and every allegation contained in all the foregoing

paragraphs as if fully set forth herein.

119.    N.Y. Gen. Bus. Law§ 350 provides, in part, as follows:

> **False advertising in the conduct of any business, trade or commerce or in the
> furnishing of any service in this state is hereby declared unlawful.**

120.    Further, N.Y. Gen. Bus. Law§ 350a(l) provides, in part, as follows:

> **The term 'false advertising, including labeling, of a commodity, or of the kind,
> character, terms or conditions of any employment opportunity if such
> advertising is misleading in a material respect. In determining whether any
> advertising is misleading, there shall be taken into account (among other things)
> not only representations made by statement, word, design, device, sound or any
> combination thereof, but also the extent to which the advertising fails to reveal
> facts material in the light of such representations with respect to the commodity
> or employment to which the advertising relates under the conditions proscribed
> in said advertisement, or under such conditions as are customary or usual ...**

121.    Defendants' labeling of the Products contains untrue and materially misleading "Non-Toxic"

"No Harsh Chemicals", and" Safe for All Surfaces" and "Safe for People, Pets & the Planet."

representations.

122.    Plaintiff and Class Members have been injured inasmuch as they relied upon the false and

deceptive representations and paid a premium for the Products.

123.    Accordingly, Plaintiff and Class Members received less than what they bargained or paid for.

124.    Defendant's packaging and product labeling induced Plaintiff and Class Members to buy

Defendant's Products.

125.    Defendants made the untrue and misleading statements and representations wantonly, and

with reckless disregard for the truth.

126.    Defendants also made the untrue and misleading statements and representations willfully, as

they knew for years that their representations were not true or accurate, yet continued to procure

them anyway.

127.    Defendants made the material misrepresentations described herein on the Products'

packaging, labeling, and marketing.

128.    Defendants' material misrepresentation was and is substantially uniform in content,

presentation, and impact upon consumers at large.

129.    Moreover, all consumers purchasing the Products were and continue to be exposed to

defendants' material misrepresentations.

130.    As a result of defendants' recurring, acts and practices in violation of GBL § 350, Plaintiff

and Class Members are entitled to monetary and compensatory damages, restitution and

disgorgement of all moneys obtained by means of defendants' unlawful conduct, interest, and

attorneys' fees and costs as well as statutory damages of $500 per unit purchased.

**Third Cause of Action:**
**(3) Breach of Warranty**
**(On Behalf of Plaintiff and the Nationwide Class and the New York Class)**

131.    Plaintiff re-alleges and incorporate by reference all allegations contained in the Complaint, as

though fully set forth herein.

132.    Plaintiff brings this cause of action for breach of warranty on their behalf individually and on

behalf of the Class (which includes the Nationwide Class and New York Class).

133.    By advertising and selling the Products at issue, Defendants made promises and affirmations

of fact on the Products' packaging and labeling, and through its marketing and advertising, as

described herein. This labeling and advertising constitute express warranties and became part of

the basis of the bargain between Plaintiff and members of the Class and defendants.

134.    Defendants purport, through the Products' labeling and advertising, to create express

warranties that the Products are a "NON-TOXIC" and contain "NO HARSH CHEMICALS."

135.    Despite Defendants' express warranties about the nature of the Products, the Products are not

"Non-Toxic" and do indeed contain "Harsh Chemicals" are not "Safe For All Surfaces" or

"Safe For People, Pets, & the Planet/[Environment]." Therefore, the Products are not what

defendants represented them to be.

136.    Accordingly, defendants breached express warranties about the Products and their qualities

because the Products do not conform to defendants' affirmations and promises.

137.    As a direct and proximate result of Defendants' breach of express warranty, Plaintiff and

members of the Class were harmed in the amount of the purchase price they paid for the

Products. Further, Plaintiff and the Class have suffered and continue to suffer economic losses

and other damages including, but not limited to, the amounts paid for the Products, plus pre and

post judgment interest, in an amount to be proven at trial. Moreover, Plaintiff and the Class are

entitled to seek, and do seek, punitive damages as a result of Defendants' malicious, fraudulent,

and oppressive conduct alleged herein.

**Fourth Cause of Action:**
**(4) Unjust Enrichment**
**(On Behalf of Plaintiff and the Nationwide Class and the New York Class)**

138.    Plaintiff re-alleges and incorporates by reference all allegations contained in the complaint,

as though fully set forth herein.

139.    Plaintiffs bring this cause of action for unjust enrichment or restitution (a quasi-contract

cause of action) on Plaintiff's behalf individually and on behalf of the Class (which includes both

the Nationwide Class and New York Class).

140.    Defendants enticed Plaintiff and the Class to purchase the Products through false and

misleading labeling and advertising that identifies the Products as "non-toxic", when the

Products' formulations contain ingredients that pose of risk of harm to humans, animals, and/or the environment.

141.    By purchasing the Products, Plaintiff and members of the Class conferred a benefit on defendants in the form of the purchase price of the Products.

142.    Defendants had knowledge of such benefit and knowingly and deliberately received such benefit. Defendants appreciated the benefit because, were consumers not to purchase the Products, defendants would not generate revenue from the sales of the Products.

143.    Defendants' acceptance and retention of the benefit is inequitable and unjust because the benefit was obtained by defendants' fraudulent & misleading representations and omissions regarding the true nature of the Products. Therefore, Plaintiff and the Class are entitled to seek, and do seek, restitution and/or disgorgement of the monies paid to defendants for the Products up to and including the total purchase price as Plaintiff and the Class would not have purchased the Products at all, or would have otherwise purchased the Products at a lesser price, had they known that the Products were not as advertised, plus pre and/or post judgment interest. Plaintiff and the Class further seek Punitive damages as a result of Defendant's malicious, fraudulent and oppressive conduct alleged herein.

## **PRAYER FOR RELIEF**

        **WHEREFORE**, Plaintiff, individually and on behalf of all others similarly situated, pray for judgment against defendants as follows:

    a.    **Injunction**: For an order requiring Defendants to immediately cease and desist from selling the unlawful Products in violation of law; enjoining Defendants from continuing to market, advertise, distribute, and sell the Products in the unlawful manner described herein; and ordering Defendants to engage in corrective action to dispel the public misconception regarding the Products;

b.    **Declaratory Relief**: For an order declaring that Defendants' conduct violates the statutes and laws referenced herein;

c.    **Monetary Damages/Restitution/Disgorgement**: For an order awarding, as appropriate under the various causes of action asserted herein, compensatory damages, monetary damages, restitution, and/or disgorgement to Plaintiff and the Class;

d.    **Punitive Damages**: For an order awarding Punitive damages;

e.    **Attorneys' Fees & Costs**: For an order awarding attorneys' fees and costs;

f.    **Pre/Post-Judgment Interest**: For an order awarding pre/ post-judgment interest; and

e.    **All Just and Proper Relief**: For any and all other and further relief that the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all causes of action so triable.

Dated: December 27, 2021
       Syosset, New York

Respectfully submitted,
By:_____S/_____
Stuart H. Finkelstein, Esq.
Finkelstein Law Group, PLLC
338 Jericho Turnpike
Syosset, New York 11791
Telephone: (718) 261-4900
sf@finkelsteinlawgroup.com